F I L E D
United States Court of Appeals
Tenth Circuit

FEB 26 1998

PATRICK FISHER
Clerk

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MARILYN INGERSON,

      Plaintiff-Appellant,

v.

HEALTHSOUTH CORPORATION,

      Defendant-Appellee.

No. 96-6395
(D.C. No. 96-CV-0020-R)
(W.D. Oklahoma)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRORBY**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **BLACK**, District Judge. [1]

---

This case involves Plaintiff/Appellant Ingerson's appeal that the district court

erred in granting summary judgment on her claims under the Americans with Disabilities

Act ("ADA"), 42 U.S.C. §§ 12101 et. seq., and a related state law claim for wrongful

termination of employment in violation of public policy. See Burk v. K-Mart Corp., 770

P.2d 24, 28-29 (Okla. 1989). Specifically, Ingerson, a registered nurse, raises three

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[1] The Honorable Bruce D. Black, United States District Judge for the District of New Mexico, sitting by designation.

questions, (1) whether she presented a factual question that "lifting" is not an essential function of her job, thus rendering her "otherwise qualified" under the ADA; (2) whether her employer, Healthsouth, could provide a reasonable accommodation, including assistance with lifting by available staff, without undue hardship; and (3) whether the district court erred in dismissing her state law claim under the Burk public policy exception to Oklahoma's employment at-will doctrine.

Healthsouth counters that the district court correctly followed Tenth Circuit precedent, including White v. York Int'l Corp., 45 F.3d 357 (10th Cir. 1995), and Milton v. Scrivner, Inc., 53 F.3d 1118 (10th Cir. 1995), in finding lifting was an essential function of Ingerson's job. Healthsouth claims the district court correctly held no reasonable accommodation exists and under the ADA, it is not required to create a new position for those with a handicap affecting an "essential function" of their job, factors that also justified dismissal of the state law claim. We affirm the district court's finding that lifting is an "essential function" of Ingerson's job. We reverse and remand with instructions to dismiss the state law claim without prejudice because the issue remains undecided under Oklahoma law.

## I.      Facts and Procedural History

On August 1, 1992, Ingerson began working for Healthsouth as a registered nurse. Ingerson suffered a stress fracture to her pelvis while transferring a patient from a wheelchair to a commode at work in June, 1993. As a result of the injury, she took sick

leave, then returned to work in September under the following restrictions: no lifting more than 10 pounds, no squatting or crawling, and no prolonged standing or walking. Her supervisor assigned her light duty jobs that complied with the medical restrictions. In January 1994, Ingerson took a second medical leave of absence. On January 12, 1994, Healthsouth, through its nursing director, notified Ingerson that she must return to work by April 4, 1994 or she would be terminated. Before doing so, she received another medical examination on March 25, 1994. The examining physician, Dr. J. Pat Livingston, concluded that Ingerson had reached maximum medical benefit, authorized a 10% permanent partial disability rating to her whole body, and recommended a permanent medical restriction of not lifting repetitively or more than 20 pounds  Livingston also released her from his care.

Ingerson returned to work, but still experienced pain from her injury and apparently aggravated it while working. On May 12, 1994, she saw another physician, Dr. J. Patrick Evans. He concluded her injury was not permanent and expressed hope that her injury would improve as long as Ingerson complied with the lifting restrictions. Despite Dr. Evan's diagnosis, Dr. Livingston assigned Ingerson a permanent and partial disability rating for workers' compensation benefits in June 1994. However, based on the diagnosis by Dr. Evans, Ingerson remained hopeful that her injury was not permanent and informed Healthsouth of her desire to remain on light duty.

As a result, Ingerson continued to work with the 20-pound lifting restriction

3

because Healthsouth's policy allowed for light duty assignment as long as a medical condition might improve. If lifting was required, a rehab technician and/or another employee would assist her--a practice available because Healthsouth routinely assigned all registered nurses one rehab technician. Under this "team" arrangement, a rehab technician or other staff were usually available to provide assistance with heavy lifting. While on light duty, however, Ingerson was "not counted" in Healthsouth's records as a nurse available for full patient care, and apparently just supplemented the existing staff.

While Ingerson acknowledged the lifting restriction affected her ability to perform some tasks, she remained capable of performing a wide range of required jobs and received satisfactory evaluations while on light duty. During this period, she spent much of her time writing patient assessments, passing out medication, counting narcotics, making rounds with physicians, reviewing care plans and filling in for the assistant nurse manager. Healthsouth also continued to monitor the status of her injury under its policy of allowing light duty from the date of injury until it became apparent the employee would not be able to return to a permanent job.

In December 1994, Linda Warner became Healthsouth's Human Resource Manager and began to inquire about Ingerson's light duty status. In 1995, Healthsouth requested an update on Ingerson's injury. On April 6, 1995, Ingerson saw Dr Evans, who provided Healthsouth with a medical report indicating Ingerson could continue to work with mild restrictions. Dr. Evans also indicated Ingerson's disability was limited to

4

a two percent impairment to the body as a whole. Healthsouth's physician, Dr. Livingston, continued to recommend the 20-pound weight lifting restriction and that Ingerson's injury was permanent. Both doctors expressed concern that the injury might reoccur if Ingerson engaged in heavy lifting. Finding both doctors now agreed that Ingerson's injury still impaired her ability to work, Healthsouth concluded the lifting restriction was permanent. Finding no position existed within the hospital for an employee with Ingerson's qualifications and lifting restriction, Healthsouth then proceeded to terminate her employment. On May 26, 1995, Warner met with Ingerson and terminated her employment.

As a result, Ingerson brought claims under the Age Discrimination and Employment Act (ADEA), 29 U.S.C.§§ 621-634, the ADA, and Oklahoma's public policy exception to at-will employment recognized by Burk. After Ingerson dropped the ADEA claim, Healthsouth moved for summary judgment on her claims under the ADA. The district court granted the motion, finding Ingerson was not "otherwise qualified" as a nurse under the Act because she could not perform an essential function of her job, including "lifting, supporting, ambulating and transferring patients." The district court also found no reasonable accommodation existed outside of a creating a limited duty position, which exceeds an employer's duty under the ADA. See Milton, 53 F.3d at 1124-25 (citing 29 C.F.R. Pt. 1630 App. 1630.2(o)). The district court also dismissed Ingerson's state law claim, finding Oklahoma law limits disability discrimination suits to

5

the adequate statutory remedy provided by the ADA.

On appeal, Ingerson recognizes the success of her ADA claim hinges on whether a reasonable juror could find "lifting" is not an essential function of her job.[2] Recognizing the same, Healthsouth bolsters its argument by arguing Ingerson spends 40 to 60 percent of her job performing the essential functions of "ambulating, transferring, and positioning patients." To avoid the prejudicial effect of such a broad classification, we will limit our inquiry to whether "lifting" is an essential function of Ingerson's job with Healthsouth.[3]

## II    Analysis

In reviewing a district court's grant of summary judgment, our review is de novo and we will apply the same legal standard used by the district court in evaluating the summary judgment motion, namely Fed.R.Civ.P. 56(c). City of Stillwell, Okla. v. Ozarks Rural Elec. Corp., 79 F.3d 1038, 1043 (10th Cir. 1996). Summary judgment is

---

[2]    Before the district court, Ingerson argued two accommodations would make her "otherwise qualified" under the Act--- a lifting device and assistance with lifting patients by available staff. The court rejected the light duty argument because the ADA does not require an employer to create a new employment position under Milton. As to the mechanical lifts, the court held there was no evidence to show this was a feasible accommodation or that this would permit the Plaintiff to perform "all" of a staff nurse's essential job functions in a safe manner.

[3]    A review of deposition testimony contained in the record shows the dangers of such an over broad classification. When asked how much time Ingerson spent "lifting" patients, for example, Beatrice Hutchinson, a floor nurse supervisor, responded with a figure ranging from 10 to 30 percent of the time. (Hutchinson dep. at 21). But when referring to how much time a Healthsouth RN is required to "transfer patients in a rehab setting," Warner, representing the employer's perspective, states it's over "50 percent of your day." (Warner dep. at 70.)

appropriate if "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). We will review Ingerson's ADA claim in light of this standard.[4]

**A.      Whether lifting is an "essential function" of Ingerson's job at Healthsouth?**

We have adopted a two-part analysis for determining whether a disabled individual is qualified under the ADA. Lowe v. Angelo's Italian Foods, Inc., 87 F.3d 1170, 1174 (10th Cir. 1996). First, we must determine whether the individual could perform the essential functions of the job, i.e. functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable her to perform those functions. Id., (citing White, 45 F.3d at 361-62).

The regulations implementing the ADA define essential functions as "those functions that the individual who holds the position must be able to perform unaided or with the assistance of a reasonable accommodation." Milton, 53 F.3d at 1123 (quoting 29

---

[4]      The district court first examined the elements required to maintain a claim under the ADA, which include: (1)  Plaintiff must demonstrate she is a disabled person within the scope of the ADA's provisions; (2) that she was qualified to perform the essential functions of her employment position; (3) that she was terminated by Defendant on account of her disability, citing Hudson v. MCI Telecommunications Corp., 87 F.3d 1167, 1168 (10th Cir. 1996) and White, 45 F.3d at 360-61.  The court found the first and third elements satisfied but determined Ingerson had not placed any material facts in dispute on the second element.

7

C.F.R. §§ 1630, App. § 1630.2(n)).  The regulations also provide that:

> "A job function may be considered essential for any of several reasons, including but not limited to the following: (i) The function may be essential because the reason the position exists is to perform that function; (ii)The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function. (3) Evidence of whether a particular function is essential includes, but is not limited to: (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applications for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of the collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs."

29 C.F.R. § 1630(n).

Ordinarily, under the regulations this is a fact question to be decided on a case by case basis. 29 C.F.R. § 1630. However, once the employer provides evidence that an element of a job is essential, the plaintiff must provide sufficient evidence to rebut that conclusion. White, 53 F.3d at 1124. Under this analysis, Healthsouth provided the following evidence: (1) Ingerson admitted that she could not ambulate, lift or move patients after her injury; (2) The RNs at the hospital spend at least 30-50% of their time transferring, moving and ambulating patients; (3) Every full-time RN at the Hospital, except Ingerson during the period she was on light duty, performed transferring, moving,

8

and ambulatory duties; (4) Ingerson testified that these physically demanding duties--lifting patients in and out of wheelchairs, helping them with bathing and personal hygiene, ambulating patients who cannot walk without assistance--were common to her job;[5] (5) Healthsouth considers ambulating, transferring and positioning patients to be an essential function of a RN, and its expert testified as such; (6) The RN job description specifically defines ambulating, transferring and positioning patients as essential and provides further that a "RN must have the ability to lift objects in excess of 100 lbs with frequent lifting and/or carrying objects weighing 50 lbs or more;" (Def. Ex. 2.) (7) Almost all the patients at the hospital require assistance with walking, bathing and other daily life activities; (8) In an emergency situation, Ingerson would not be able to perform this critical function, which could result in dangerous consequences.

Ingerson counters that many important nursing tasks do not involve lifting. As a result, the restriction did not affect an essential function. For example, she spent much of her time writing patient assessments, passing out medication, counting narcotics, making rounds with physicians, reviewing care plans and filling in for the assistant nurse manager. Ingerson also argues that the "lifting" aspects of her duties were limited by the organization of the department. For example, Ingerson provides evidence, largely through testimony of her supervisors, that shows the hospital staff worked as a team and

---

[5] While admitting it was a "common" part of her daily duties at her deposition, Ingerson said she actually considered "lifting" as a secondary function of her job. (Dep. at 35, 77.)

others, frequently an assigned rehab specialist, did the heavy lifting. Ingerson also argues the time spent on one essential function must be balanced against the number of employees available among whom the performance of that job function can be distributed under 29 C.F.R. § 1630(n)(2)(ii). As a result, Ingerson claims this evidence places in dispute the question of whether "lifting" is an essential function.

At the outset, the Court agrees with Ingerson that the ADA states an essential function requires a consideration of several factors which is often best resolved by the weighing of facts by a jury. Accord Barber v. Nabors Drilling U.S.A., Inc., 130 F.3d 702, 1997 WL 751274 at 4 (5th Cir. 1997) (highly deferential standard is especially appropriate with regard to jury's determination of what the essential functions of the job are, since the determination most often consists of post hoc descriptions of what the employee was expected to do and what he actually did, which necessarily requires the jury to judge the credibility of witnesses and the veracity of their testimony). See also Tuck v. HCA Health Services of Tenn., Inc., 7 F.3d 465, 470 (6th Cir. 1993) (when hospital offers a restricted duty program in order to allow a temporarily handicapped person to remain employed, it is a question of fact for the jury whether the employment on light duty indicates the employee is "otherwise qualified"); Gauthreaux v. Baylor Univ. Medical Center, 879 F. Supp. 634, 638 (N.D. Tex. 1994) (whether nurse's duties of transferring patients, restraining patients and other duties involving heavy lifting are essential functions is question for jury). However, that does not mean every "essential

10

function" inquiry must go to the jury. We find this is such a case because no reasonable jury could find for Ingerson after applying the factors set forth by 29 C.F.R. § 1630.

After reviewing the depositions of Ingerson and her supervisors, there is no question that a lifting restriction directly affected Ingerson's ability to care for Healthsouth's patients. Even if we ignore Healthsouth's claim that this care involved 60 percent of Ingerson's time, Ingerson's job description leads to the conclusion that lifting is an essential function. See Holbrook v. City of Alpharetta, Ga., 112 F.3d 1522, 1527 (11th Cir. 1997) (percentage of time on task not dispositive of whether task is essential function; holding infrequently performed field work to be essential function of detective). Ingerson's job description contains three pages of essential position responsibilities with over 66 tasks, ranging from administration duties to supervising patients, and maintaining job qualifications. For each of the essential functions listed, the job description outlines the necessary physical characteristics associated with each. The physical capability to "lift" appears as a requirement in every essential function. Further, the physical tasks section specifically states the following requirement, "must be able to lift objects in excess of 100 pounds with frequent lifting and/or carrying of objects weighing 50 pounds or more." (Def. Ex. 2.) Finally, the job description requires such physical tasks be performed with little or no supervision. As a result, there is little question that the job description encompasses lifting as an essential function of employment as a registered nurse at Healthsouth.

11

Our inquiry does not end here, however.  See Tuck, 7 F.3d at 476 (determination that lifting is essential function of job should not hinge on official job description, and should be determined by the actual demands of the job) (citing Hall v. U.S. Postal Service, 857 F.2d 1073, 1079 (6th Cir. 1988)).  Other evidence supports the same conclusion. For example, Ingerson admits that lifting is a common part of her job because she frequently had to move patients from their beds to a wheel chair, or to a commode--a fact which caused her initial injury. Additional evidence shows many of Healthsouth's patients required this type of rehabilitative care, which raises a legitimate concern for patient safety in light of Ingerson's lifting restriction.  Finally, the record indicates that Healthsouth maintained Ingerson in light duty status until it received conclusive proof her injury was permanent.

In light of this evidence, we affirm the district court, finding "lifting" is an essential function of Ingerson's employment with Healthsouth.[6]

**B.**     **Whether Ingerson raised sufficient facts to show Healthsouth could provide**

---

[6]     Because the record points persuasively to the conclusion that Ingerson cannot perform an essential function of her job as a nurse at Healthsouth, the question of whether she would pose a "direct threat" to the health or safety of others by virtue of her disability--an alternative basis for finding her not "otherwise qualified" under the ADA--will not be addressed. See Doe v. Univ. of Maryland Medical Systems Corp., 50 F.3d 1261, 1264-65 (10th Cir. 1995) (discussing factors in determining whether plaintiff presents a risk to others under ADA); Chiari v. City of League City, 920 F.2d 311, 317 (5th Cir. 1991) (discussing personal safety factors).  Accordingly, Healthsouth's motion for leave to file a Sur Reply Brief is moot and is hereby denied.

**reasonable accommodations to overcome Ingerson's disability?**

Under the ADA, once it is determined a person cannot perform an essential function of the job without accommodation, the court must consider whether a plaintiff has demonstrated a genuine issue of fact regarding his or her ability to perform the essential functions with reasonable accommodations. Milton, 53 F.3d 1118, 1124. The trial court considered whether Ingerson requested a "reasonable accommodation" and recognized that "Plaintiff's evidence certainly shows it was possible for [Healthsouth] to continue to permit [Ingerson] to work as an 'extra' hand at its facility, and leave the physically tasking (sic) duties such as lifting patients to other staff members." (Mem. at 10.) But, the trial court concluded the accommodation was not reasonable as the ADA does not require an employer to reallocate job duties in order to change the essential function of the job. We agree and affirm. Although job restructuring is a possible accommodation under the ADA, it is limited to reallocating only the marginal functions of a job. 29 C.F.R. § 1630.2(o)(2)(ii). We have consistently held that it is not a reasonable accommodation to require the employer to eliminate an essential function of the job, in effect creating a new job for a plaintiff. Smith v. Blue Cross Blue Shield of Kan., Inc., 102 F.3d 1075, 1076 (10th 1996); Milton, 53 F.3d at 1124 (citing C.F.R. § 1630.2(o)), White, 45 F.3d at 362. See also McCollough v. Atlanta Beverage Co., 929 F. Supp. 1489, 1501 (N.D. Ga. 1996) (holding that shifting all lifting duties from the Plaintiff, the Route Assistant, to his accompanying Driver/Salesperson is not a reasonable

13

accommodation because it "redefines not only plaintiff's essential duties, but also the essential duties of the Driver/Salesman").

**C.     Whether district court erred in dismissing state law claims?**

In reviewing a district court's decision to dismiss pendant state law claims, we apply an abuse of discretion standard. Anglemyer v. Hamilton County Hosp., 58 F.3d 533, 541 (10th Cir. 1995). A district court has discretion to try state claims in the absence of any triable federal claims. Id., (citing Thatcher Enterprises v. Cache County Corp., 902 F.2d 1472, 1478 (10th Cir. 1990)). In Thatcher, the court noted "[H]owever, that discretion should be exercised in those cases in which, given the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by its retaining jurisdiction." Id. If none of the four factors apply, dismissal of the pendant state law claim is appropriate. Id.

Further, we have held that when federal claims are resolved prior to trial, the district court should usually decline to exercise jurisdiction over pendant state law claims and allow the plaintiff to pursue them in state court. Ball v. Renner, 54 F.3d 664, 669 (10th Cir. 1995). We have applied this general principle when state law is unclear or in the process of evolving. Id. See also Snyder v. Murray City Corp., 124 F.3d 1349, 1354 (10th Cir. 1997).

In the present case, the district court determined Ingerson's state law claim, a public policy tort claim, was not cognizable under Oklahoma law, citing List v. Anchor

14

Paint Manufacturing Co., 910 P.2d 1011, 1013-14 (Okla. 1996) (holding statutory causes of action for discriminatory discharge provide plaintiffs with their exclusive remedy). In addition, the court held that on the merits, the state law claim failed for the same reason as the ADA claim--Plaintiff could not show she was qualified for the position of staff nurse. On appeal, Ingerson argues that state law is unsettled regarding the public policy exception created by Burk, when applied to handicap discrimination, and the claim should be remanded to state court.

We agree that Oklahoma law is unsettled on claims of handicap discrimination under the public policy exception recognized by Burk.[7] A review of Oklahoma law shows considerable confusion among both the federal and state courts in applying the Burk public policy exception to claims for discrimination. We have therefore consistently held Burk claims must have their basis in Oklahoma state law. Richmond v. Oneok, Inc., 120 F.3d 205, 210 (10th Cir. 1997) (citations omitted). Unlike the plaintiff in Oneok,

---

[7]     The district court correctly determined that any claim for handicap discrimination under Oklahoma's anti-discrimination statute would fail for the same reason as Ingerson's claim under the ADA. However, Ingerson brings her claim under the public policy exception of Burk as a common law tort, which differs from a claim under the statute. (Compl. Count IV.) For example, the Oklahoma Anti-discrimination Act prohibits discrimination against an individual because of his handicap unless the action is related to a "bona fide occupational qualification reasonably necessary to the normal operation of the employer's business." Okla. Stat. tit. 25, § 1302(A)(1). Thus, finding Ingerson could not perform an "essential function" under the ADA would also preclude a claim under Oklahoma's Act. But under the public policy exception, the inquiry differs significantly and is not necessarily controlled by List as found by the district court. See generally Hayes v. Eateries, Inc., 905 P.2d 778, 785-89 (Okla. 1995) (discussing elements of action under Burk).

15

however, Ingerson has cited applicable state law in <u>Atkinson v. Halliburton Co.</u>, 905 P.2d 772 (Okla. 1995) (holding Oklahoma Anti-discrimination Act, 25 Okla. Stat. Ann. § 1302 (Supp. 1994), does not provide exclusive remedy for handicap discrimination; therefore, a plaintiff may pursue a tort claim for discharge from employment in violation of public policy without pleading statutory claims).

The district court apparently found <u>Atkinson</u> overruled by the Oklahoma Supreme Court in <u>List</u>, which refused to find a common law remedy for age discrimination in employment by concluding statutory remedies were exclusive. We do not think this conclusion embodies an accurate reflection of Oklahoma law. In precluding a <u>Burk</u> remedy for age discrimination claims, the <u>List</u> court distinguished its decision in <u>Tate v. Browning-Ferris</u>, 833 P.2d 1218 (Okla. 1992), which held that a common law action for racially motivated discharge was not preempted by Title VII or by Oklahoma's Anti-discrimination Act. The court found the federal Age Discrimination Act embodied a more comprehensive remedial scheme than either Title VII or the Oklahoma Anti-discrimination Act. The <u>Atkinson</u> court, however, relying on <u>Tate</u>, conducted a similar analysis and determined Oklahoma's Anti-discrimination Act does not provide an exclusive remedy for handicap discrimination. <u>Id.</u>, 905 P.2d 774. <u>See</u> <u>also</u> <u>Davies v. American Airlines, Inc.</u>, 971 F.2d 463, 467 (10th Cir. 1992) (holding remedy under <u>Burk</u> available despite statutory remedies after <u>Tate</u>).

In <u>Marshall v. OK Rental & Leasing, Inc.</u>, 939 P.2d 1116, 1120 (Okla. 1997), the

16

court again emphasized the importance of finding an adequate statutory remedy when precluding a Burk claim. Id. (holding Burk exception did not apply when employee's sexual harassment claim is based on status rather than conduct, and she had adequate remedies under state and federal anti-discrimination statutes). As a result, the question of whether a Burk remedy is available appears to hinge on the existence of an adequate statutory remedy and whether a claim is based on status rather than conduct. See Collier v. Insignia Financial Group, CIV-97-1142-R (filed Aug. 26, 1997 W.D. Okla.) (certifying questions on whether adequate state remedy exists for *quid pro quo* sexual harassment after List and Marshall). Since Atkinson, the Oklahoma Supreme Court has not found an adequate statutory remedy for disability discrimination or specifically addressed whether the ADA provides one. We decline the invitation to decide that issue now.

In light of Atkinson, the unsettled nature of the law in this area, and the complex issues of state law presented, we decline to exercise supplemental jurisdiction over Ingerson's Burk state law claim.[8] We therefore reverse as to the state law claim and remand that claim to the district court with instructions to dismiss without prejudice. Snyder, 124 F.3d at 1355.


AFFIRMED in part, REVERSED in part, and REMANDED to the district court.

_____

[8] We also note that the certified questions in Collier may not resolve the question before this court. As a result, we find remand to the state court presents a better resolution of this issue.

ENTERED FOR THE COURT


Bruce D. Black
District Judge