**Maria HORSEWOOD, Plaintiff,**

v.

**KIDS "R" U.S. d/b/a Toys "R" Us— Delaware, Inc., Defendant.**

**Civil Action No. 97–2441–GTV.**

United States District Court, D. Kansas.

Nov. 30, 1998.

Denise M. Anderson, Anderson Platts Law Firm, Kansas City, MO, for Maria Horsewood.

James R. Williams, Beth R. Meyers, Mindy S. Novick, Jackson, Lewis, Schnitzler & Krupman, New York City, Loyd E. Owen, Jr., Melody L. Nashan, Lathrop & Gage L.C., Kansas City, MO, for Kids "R" Us.

## MEMORANDUM AND ORDER

VANBEBBER, Chief Judge.

Plaintiff Maria Horsewood brings this action alleging that defendant Kids "R" Us violated the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, by terminating her on the basis of her disability without reasonable accommodation. The case is before the court on defendant's motion (Doc.73) for summary judgment. For the reasons set forth below, defendant's motion is denied.

### I. FACTUAL BACKGROUND

The following facts are either uncontroverted or are based on evidence submitted with the summary judgment papers and viewed in a light most favorable to the non-moving party. Immaterial facts and facts not properly supported by the record are omitted.

Plaintiff is thirty-five-years old and has suffered from diabetes for the last twenty-seven years. On a daily basis, plaintiff suffers from the following symptoms: feeling weak, tired, or dizzy; excessive thirst; frequent urination; blurred vision; lack of ability to concentrate; loss of coordination; and increased hunger. To help avoid these symptoms, plaintiff needs to take a brief walk approximately once per hour and to eat frequently.

Plaintiff experienced a debilitating pregnancy in 1989. During and shortly after plaintiff's pregnancy, her diabetes caused severe and permanent damage to her eyesight. In addition to impaired visual acuity, plaintiff has limited peripheral vision and poor depth perception. She suffered complete vision loss in her left eye. Her diabetes also caused retinopathy—a noninflammatory disease of the retina—in her right eye. After corrective surgery to repair the retinopathy, she developed a cataract on her right eye. The cataract was not removed during plaintiff's employment with defendant because she maintained partial vision and removal involved a significant risk of losing all vision in the right eye.

During her employment with defendant, plaintiff's vision in her right eye was poor: she could see large contrasting print, but could not see small, fine or light print without magnification or enhancement. She was and is able to read a computer screen and use a keyboard. She has completed a word processing training course and has trained as a data entry operator with proofreading and accuracy skills. Plaintiff also can perform accounting functions. Prior to her employment with defendant, plaintiff worked in many jobs involving computer, accounting, word processing, mathematical, cash register, and customer service skills, although some of those jobs ended prior to her vision loss.

Defendant is a retail store chain that sells toys, clothing, and other merchandise for children. Plaintiff worked at defendant's store in Overland Park, Kansas. During plaintiff's employment with defendant, the Overland Park store's management consisted of store manager Nora Hard and assistant managers Carol Haws and Jeannie Simmons. During the first two and one-half months of plaintiff's employment, defendant's district manager, Julie Curran, maintained her office in the Overland Park store.

On March 16, 1996, plaintiff completed an employment application for defendant's Overland Park, Kansas store. Plaintiff testified that she took the application out of the store and her husband assisted her in reading and completing the application. Plaintiff told Carol Haws, the assistant manager on duty at the time, that she was "legally blind" and had trouble reading "really small print." Nora Hard, the store manager, however, did

not know that plaintiff had impaired vision when she was hired.

On March 19, 1996, Haws interviewed plaintiff. Plaintiff had indicated on her application that she was only interested in part-time work and that she was available only from 9:00 a.m. to 1:00 p.m. on Monday through Friday. Plaintiff had not applied for the front office coordinator position, but Haws suggested the position to her. Haws showed plaintiff a detailed written description of the front office coordinator position. One of the functions listed under the heading "Essential Functions" was operating "Financial Accountability of Sales Transactions" ("FAST"), the company computerized sales reconciliation system. The job description states that operating FAST requires an individual able to "sort and organize all related media, prepare cash and check deposits, keypunch all information, [and] audit for accuracy." Further, Haws explained to plaintiff that operating FAST involved a lot of data entry and counting the money kept in the safe. Also under the heading "Essential Functions", the job description listed: (1) employee information maintenance; (2) cashier error log; (3) layaway files; (4) price change documents; (5) customer service; and (6) loss prevention. Plaintiff used a magnifying glass to read the description and then signed it, affirming that she was able to perform all of the listed functions.

Although the job description listed many functions of the front office coordinator, the specific duties and tasks of the coordinator vary on a store-by-store basis. Haws stated in her deposition that "FAST is the actual job task that a front office coordinator performs." Haws also testified that management expected plaintiff to perform only the FAST program and that plaintiff was not trained on several of the functions listed on the job description. Moreover, Jean Rathbun, the Overland Park store manager who succeeded Nora Hard, admitted in her deposition that FAST is the primary responsibility of the coordinator position. The coordinator is expected to complete the accounting procedures associated with the FAST program during the first four hours of every business day. If plaintiff completed FAST during her shift, she then could perform other functions listed on the job description or help the floor associates.

During the interview, Haws inquired whether plaintiff would be able to perform the functions listed, particularly using a computer and inputting data. Plaintiff testified in her deposition that, at the time of her interview, her only concern was that she had not worked on a computer in a long time. Despite the fact that plaintiff used a magnifying glass during the interview and told Haws that she was legally blind, store management did not discuss with her any possible accommodations. During her deposition, plaintiff admitted that she uses a home computer very rarely because of her vision impairment. She further testified that she can see the words on the computer screen by making the font very large, changing the colors on the screen to white letters with a black background, and using her magnifying glass. After Haws offered the position to plaintiff and plaintiff accepted, Haws showed plaintiff the computer. Plaintiff indicated that the keypad numbers were too small for her to see. As a result, Haws placed stickers with enlarged numbers on the keypad. Plaintiff testified that the stickers enabled her to see the numbers on the keypad. Haws did not show plaintiff examples of the media that she would be reviewing.

On plaintiff's first day of work, she participated in a one-hour orientation to Kids "R" Us, learned about defendant's policies, and received the employee's handbook. The handbook provides that, during January through September, each employee may take a fifteen-minute break during each four-hour shift. During the remainder of plaintiff's shift on her first day, Jeannie Simmons, an assistant manager, trained plaintiff to operate FAST. Plaintiff's training included reviewing information on the service desk forms and what information from the forms needed to be input into the FAST program. On plaintiff's second day of work, she was trained in more duties related to the FAST program, including counting money in the safe, counting the pull envelopes which contained the prior days' receivables, and inputting this information into the FAST program.

On plaintiff's first day, she suffered from low blood sugar. Simmons told plaintiff that she could eat or drink in the office while performing her job, despite defendant's policy to the contrary. Plaintiff was also told that she could take breaks from her job whenever necessary, notwithstanding the one-break-per-four-hour-shift policy. Plaintiff worked in a very small office, to which the door was always locked. Whenever plaintiff left the room, all of the money had to be put into the safe and the door had to be locked. Plaintiff requested a key to the front office to facilitate her frequently needed breaks. Despite plaintiff's request, she was not given a key and had to rely on a manager letting her into the office each time she took a break. Defendant relied on its policy that only managers and other designated key holders could have keys to the front office. Amy Boll, a sales floor associate, had a key to the front office even though she was not a manager. Plaintiff testified in her deposition that denying her a key to the front office inhibited her efficiency because she was required to find a manager to let her back into the office.

Plaintiff recognized that her limited vision impaired her ability to perform the job functions, but she did not mention it to anyone during her first week of work. Early in plaintiff's employment, Julie Curran, the district manager, frequently asked plaintiff how the job was going and plaintiff responded that everything was fine. Plaintiff testified in her deposition that she had difficulty reading the cash register reports and that she later requested that store management change the print ribbons on the cash registers and the print toner on the computer printers whenever she informed them that the print was too light for her to read. Plaintiff testified, however, that Nora Hard avoided her requests to change the printer ribbon. On one occasion, the managers failed to quickly change the ribbon so plaintiff requested that Hard teach her how to change the ribbon herself. Plaintiff did not request any other accommodations for her vision impairment.

On her own initiative, Hard purchased a "sewer's magnifying glass" that plaintiff could wear around her neck, enabling her to use her hands for other tasks. Hard purchased the magnifier because she believed it would help plaintiff perform more effectively. Plaintiff testified in her deposition that she did not regularly use the magnifier because it was too awkward to use.

Defendant also hung a magnifying device provided by plaintiff's husband over the computer screen to enlarge the print on the screen, but plaintiff did not regularly use that device either. The device was a vinyl table top magnifier intended for use with papers on a desk. Plaintiff had brought the magnifier to work after she realized she would have to read checks, credit card charge slips, and other types of small print. The device was not intended as an enhancement for the computer, but defendant hung it over the computer. Plaintiff testified in her deposition that the device did not help her read the computer.

If plaintiff had a problem, she sought and received assistance from Carol Haws or Jeannie Simmons. She asked for help at least once per four-hour shift. Because plaintiff did not master the operation of FAST, she was not trained on all of the other alleged functions of the job, nor was she terminated for failure to perform the other functions.

Management verbally counseled plaintiff approximately three to four times per week concerning job performance. Plaintiff received written counselings after receiving numerous verbal warnings. On May 17, 1996, during the ninety-day introductory employment period, plaintiff received her first formal written counseling. The written report stated that plaintiff failed to lock the safe before leaving the front office. Plaintiff had received prior oral counseling regarding defendant's policy requiring her to lock the safe before leaving the office unattended. Plaintiff admitted in her deposition that her failure to lock the safe was unrelated to her vision impairment. After her first ninety days of employment, plaintiff received an overall "meets expectations" rating on her evaluation. Carol Haws read the evaluation form to plaintiff.

Plaintiff received her first post-introductory-period formal written counseling on Au-

gust 8, 1996. The written report stated that plaintiff had made several errors in operating FAST, including using the wrong codes, plaintiff had incorrectly counted the money in the safe, requiring a recount by management, and plaintiff had misplaced money by dropping it on the floor and throwing away an envelope containing money.

Plaintiff received another written counseling on August 22, 1996. The written report cited plaintiff's failure to lock the safe while she left the office, her failure to reconcile inputted check data, and her failure to inform management about a missing layaway. Plaintiff again received a written counseling on August 29, 1996. The written report cited plaintiff's failure to correctly input information on a layaway void, despite recent training on the matter, which required management to correct the FAST program. The report also stated that plaintiff had constantly requested assistance with the completion of FAST and failed to complete FAST in a timely manner.

Defendant terminated plaintiff's employment on August 30, 1996. Plaintiff's termination followed another oral counseling regarding her inability to resolve a problem that she had previously been taught how to resolve. Nora Hard, the store manager, testified that she discovered plaintiff's error and concluded that plaintiff's ability to resolve problems had not sufficiently improved over the course of her employment because she was continually making errors inputting information into FAST, and she was unable to fix the errors on her own. Defendant, however, knew that the errors were caused by plaintiff's vision problems. Plaintiff had received numerous oral counselings and three written counselings after her introductory period.

Plaintiff offered evidence that defendant applied its progressive discipline policy inconsistently. Jean Rathbun testified in her deposition that during Hard's tenure as manager, the progressive counseling procedures were not enforced consistently. Hard did not apply the procedures equally to all associates. For example, Amy Boll, a sales floor associate in the Overland Park store, received three or four written counselings and was not discharged from her job.

At her deposition, plaintiff suggested that defendant could have provided her with a reader to read all of the media and reports. Plaintiff also suggested that magnifying eyeglasses or a bigger computer monitor would have constituted a reasonable accommodation. Screen magnifiers and screen readers are available for persons who have a difficult time reading the small print on a computer.

Defendant submitted evidence indicating that on average, associates learn to operate the FAST system in two to three weeks and can accurately complete FAST within two hours. On the other hand, plaintiff submitted evidence that Jean Rathbun, who has several years of experience operating the FAST program, completed FAST in three hours after the slowest day of the week which involved the fewest cashier drawers to count. Rathbun counted only three drawers, whereas eight to ten drawers needed to be counted on the busiest days. Moreover, she enlisted the help of associates to gather up the drawers and take them to the floor, and to address a layaway void problem. Such assistance was unavailable to plaintiff. She also used the FAST manual, which was never available to plaintiff, during the reconciliation process. Rathbun admitted in her deposition that she made mistakes in the process despite better working conditions.

Plaintiff also contends that defendant could have reassigned her to a sales floor position. When Carol Haws initially offered the coordinator position to plaintiff, they agreed that if the coordinator job did not work out, plaintiff would try another position. Prior to her termination, plaintiff again suggested to management that she be transferred to a floor position and management discussed transferring plaintiff. Defendant's job description of the sales floor position includes under the heading "Essential Functions" all of the cashier functions, reticketing merchandise and repricing, and providing good customer service, including quickly completing sales transactions. Plaintiff learned some of the functions of the sales floor position, including operating the cash register, price changing, and restocking. Although Nora

Hard testified that plaintiff had difficulty reading the cash register screen, plaintiff stated in her affidavit that she can see the screen well enough to operate the register. Moreover, she was able to read the price tags with her magnifying glass. A sales floor associate, like a coordinator, was not required to perform all of the functions listed on the job description.

Even though all three managers and plaintiff agreed that plaintiff should try a position on the sales floor, Hard discharged plaintiff without a transfer. Hard stated in her deposition that she believed that there was no way to accommodate plaintiff's vision impairment to allow her to perform any job at the store. When Hard discharged plaintiff, she held a ticket in front of plaintiff's face and asked "can you read this?" Hard also stated that she did not believe the sales floor position could be modified so that plaintiff did not have to read tickets. Hard admitted in her deposition that she did not ask plaintiff if she could read tickets with a magnifying glass. Hard simply believed that plaintiff could not do any job in the store and considered plaintiff to be disabled.

Plaintiff earned $5.00 per hour in her position with defendant and was not eligible for benefits because of her part-time status. Following her termination, plaintiff worked at a bagel store earning approximately the same hourly wage she earned working for defendant. After she left the bagel store, she began working at a Target Superstore and has earned a higher hourly wage than she earned working for defendant.

## II. SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lob-*

*by, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be met by showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. "A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* Thus, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* The court must consider the record in the light most favorable to the party opposing the motion. *Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir.1984).

## III. DISCUSSION

The Americans with Disabilities Act (ADA) prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The *McDonnell Douglas*[1] burden-shifting analysis applies to cases brought under the ADA. *See Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997).

■ To establish a prima facie case of disability discrimination, plaintiff must demonstrate: (1) that she is a disabled person

---

1. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

under the ADA; (2) that she is qualified, i.e., that she can perform the essential functions of the job with or without reasonable accommodation; and (3) that the employer discharged her under circumstances giving rise to an inference that termination was based on disability. *Id.* If plaintiff raises a genuine issue of material fact as to each element of the prima facie case, the burden then shifts to defendant to articulate some legitimate, nondiscriminatory reason for its adverse employment decision. *Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995). If defendant carries this burden, it shifts back to plaintiff to prove that the reasons proffered are pretextual—i.e. unworthy of belief. *Id.* Demonstrating pretext gets plaintiff "over the hurdle of summary judgment." *Ingels v. Thiokol Corp.,* 42 F.3d 616, 622 n. 3 (10th Cir.1994).

### A. Disabled

The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Plaintiff suffers from diabetes which has caused partial blindness.

Defendant argues that plaintiff's impairment does not substantially limit a major life activity. Major Life Activities means "functions such as caring for oneself, performing manual tasks, walking, *seeing,* hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (1997) (emphasis added). The Tenth Circuit has expressly recognized that seeing is a major life activity. *Sutton v. United Air Lines, Inc.,* 130 F.3d 893, 900 (10th Cir.1997). "Substantially limits" means "either the inability to perform a major life activity, or a severe restriction on the ability to perform a major life activity as compared to the general population." *Dutton v. Johnson County Bd. of County Comm'rs,* 859 F.Supp. 498, 505 (D.Kan.1994) (citing 29 C.F.R. § 1630.2(j)(1)). Whether plaintiff is substantially limited depends on the nature and severity of her impairment, its expected duration, and its expected permanent or long-term impact. 29 C.F.R. S

1630.2(j)(2); *see also Bolton v. Scrivner, Inc.,* 36 F.3d 939, 943 (10th Cir.1994).

■ Plaintiff is permanently blind in her left eye and suffered partial vision loss in her right eye, which was exacerbated by a cataract at the time that she was employed by defendant. The cataract resulted from the surgery performed to correct the retinopathy that resulted from the diabetes. The cataract remained throughout plaintiff's employment with defendant because an attempted removal would have involved a substantial risk of complete vision loss in the right eye. Although the cataract was later removed, it severely limited the vision in her right eye during her employment with defendant. Her vision loss impairs not only her visual acuity, but also her depth perception and her peripheral vision. The court concludes that plaintiff's diabetes and her resulting vision loss substantially limit her ability to see.

■ Even if plaintiff were not actually disabled, plaintiff submitted evidence that Nora Hard, the store manager, regarded plaintiff as being disabled. *See* 42 U.S.C. § 12102(2)(C) (disabled includes regarded as being disabled). Hard testified in her deposition that she believed plaintiff could not see well enough to do any job in the store and that there was no accommodation that would allow plaintiff to see better. Moreover, Hard testified that she considered plaintiff to be disabled. Plaintiff has created a genuine issue of material fact whether defendant regarded her as substantially limited in her ability to see.

### B. Qualified

■ The Tenth Circuit applies a two-part analysis to determine whether a person is qualified under the ADA. *See Aldrich v. Boeing Co.,* 146 F.3d 1265, 1271 (10th Cir.1998). First, the court must determine whether the individual can perform the essential functions of the job. *Id.* Second, if the essential functions cannot be performed, the court must determine whether any reasonable accommodation would enable the individual to perform such functions. *Id.* Here, plaintiff acknowledges that she is unable to perform the essential functions of the job without accom-

modation. Thus, the court will proceed directly to the second step of the analysis.

■ The parties disagree about the essential functions of the front office coordinator position. The essential functions of a job are "functions that bear more than a marginal relationship to the job at issue." *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1123 (10th Cir. 1995). The court must examine "whether an employer actually requires all employees in the particular position to perform the allegedly essential function." *Id.* at 1124. Defendant suggests that all of the duties listed on the job description under the heading, "Essential Functions," are the essential functions of the job. The essential functions, however, are determined by the actual demands of the job rather than the job description. *Ingerson v. Healthsouth Corp.*, 139 F.3d 912, No. 96-6395, 1998 WL 88154, at *6 (10th Cir. Feb.26, 1998); *Hall v. United States Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir.1988). Plaintiff has offered evidence that the coordinator's only actual function is operating the FAST program. Thus, she has created a genuine issue of fact regarding the essential functions of the coordinator position.

■ That issue of fact, however, will not preclude summary judgment unless plaintiff can perform the FAST program with reasonable accommodations. *See Milton*, 53 F.3d at 1124. Defendant argues that it accommodated plaintiff allowing her to take frequent breaks, giving her a "sewer's magnifying glass," and hanging a magnifier over the monitor. Plaintiff, however, has offered evidence that defendant's refusal to give her a key to the front office, despite the fact that she is trusted to be alone with everything in the front office, has caused needed breaks to effect her work efficiency. Plaintiff also offered evidence that the sewer's glass and table top magnifier hung over the monitor were awkward and ineffective.

Plaintiff has the burden to make a facial showing that accommodation is possible. *Id.* Plaintiff has offered evidence that she has experience with accounting and computer functions. Plaintiff has suggested several accommodations which would enable her to perform the FAST function, including a larger computer monitor, a screen magnifier, or magnifying glasses. Plaintiff also suggested that she could do her job much faster if the managers, instead of plaintiff, changed the printer ribbons and if plaintiff received a key to the front office. Plaintiff offered evidence that defendant was aware of her vision problems and that such accommodations are available. She also submitted evidence of her need for frequent breaks and of other non-managers who received a key to the front office. Plaintiff has created a genuine issue of fact regarding whether she is able to perform the essential functions of the job with reasonable accommodations.

### C. Adverse employment action based on disability

■ Plaintiff must present some affirmative evidence that her termination was based on her disability. *Morgan*, 108 F.3d at 1323. Plaintiff has offered evidence that she was discharged because she was unable to operate FAST. Plaintiff has offered evidence that defendant knew that her inability to operate FAST was caused by her disability. Therefore, plaintiff has provided sufficient evidence to create a genuine issue of material fact whether her termination directly resulted from her disability.

### D. Legitimate nondiscriminatory reason/pretext

■ Defendant asserts that it discharged plaintiff pursuant to its policy requiring termination because she received three written counselings. Plaintiff has the burden to establish a genuine issue of fact whether defendant's proffered reason is pretextual. *Id.* Plaintiff has met her burden. Plaintiff offered evidence that another employee received at least three written counselings and was not terminated. *See id.* (different treatment of similarly situated employees not in protected class is evidence of pretext). Moreover, plaintiff offered evidence that most of the counselings involved her data-inputting problems and untimeliness operating FAST. Both alleged failings were directly related to her disability which defendant was aware of and failed to accommodate. Plaintiff also submitted evidence that Nora Hard, the store manager, immediately before ter-

minating her, stuck a ticket in plaintiff's face and asked, "can you read this?" Plaintiff has offered enough evidence to create a genuine issue of material fact whether defendant's proffered legitimate reason for termination is pretextual.

### E. Damages

██ Defendant contends that plaintiff is precluded from an award of lost wages or punitive damages. Defendant argues that lost wages are precluded here because plaintiff has earned an equal or greater hourly wage since leaving defendant's employment. *See Tyler v. City of Manhattan*, 118 F.3d 1400, 1413 (10th Cir.1997) (Title VII remedies apply in ADA employment cases); *Pitre v. Western Elec. Co.*, 843 F.2d 1262, 1274 (10th Cir.1988) (purpose of lost wages award is to make plaintiff whole). Defendant offered evidence that after leaving defendant's employment, plaintiff earned approximately the same hourly wage while working at a bagel store and then earned a higher hourly wage while working at a Target. Defendant's evidence does not establish that plaintiff earned equal to or greater wages at all times after her employment with defendant. Accordingly, defendant's evidence is insufficient to preclude plaintiff as a matter of law from an award of lost wages.

██ Defendant also argues that plaintiff is precluded from an award of punitive damages, contending that there is no evidence defendant's conduct was malicious or recklessly indifferent to federally protected rights. *See* 42 U.S.C. § 1981a(b)(1) (requiring finding of malice or reckless indifference). The court disagrees. "The requisite level of recklessness [to support a punitive damages award] can be inferred from management's participation in the discriminatory conduct." *Adakai v. Front Row Seat, Inc.*, 125 F.3d 861, No. 96–2249, 1997 WL 603458, at *2 (10th Cir. Oct.1, 1997). A jury could construe defendant's conduct in this case to show reckless indifference. Therefore, at this stage of the proceedings, the court will not preclude plaintiff as a matter of law from an award of punitive damages.

IT IS, THEREFORE, BY THE COURT ORDERED that defendant Kids "R" Us' mo-

tion (Doc.73) for summary judgment is denied.

Copies of this order shall be mailed to counsel of record for the parties.

**IT IS SO ORDERED.**