**Neala A. BURNETT, Plaintiff,**

v.

**PIZZA HUT OF AMERICA, INC., Defendant.**

**No. 96–4159–SAC.**

United States District Court, D. Kansas.

March 8, 2000.

Robert M. Carroll, Koch Industries, Inc., Wichita, KS, Mary C. O'Connell, Patricia A. Rosa, Thomas N. Sterchi, Kara Trouslot Stubbs, Baker, Sterchi, Cowden & Rice, L.L.C., Kansas City, MO, for Defendant.

Lisa Beth Otipoby, Kaw Enterprise Development Authority, Kaw City, OK, James E. Rumsey, Lawrence, KS, for Plaintiff.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

The plaintiff, afflicted by fibromyalgia, brings this action under the Americans with Disabilities Act, ("ADA") 42 U.S.C. §§ 12101. *et seq.*, claiming that the defendant violated the ADA in not returning the plaintiff to her former position with reasonable accommodation and in terminating her employment in retaliation for exercising her rights under the ADA. The defendant seeks summary judgment arguing that the plaintiff is unable to prove a prima facie case on either claim and asserting a limitations bar for damages prior to April 27, 1995. (Dk.75). The plaintiff opposes summary judgment. (Dk.88). The court issues the following as its ruling on this long pending motion.

## SUMMARY JUDGMENT STANDARDS

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.,* 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348; it requires " 'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' " *Thomas v. International Business Machines,* 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991)). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.,* 45 F.3d 357, 363 (10th Cir. 1995).

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 346 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

Summary judgments " 'should seldom be used in employment discrimination cases.' " *O'Shea v. Yellow Technology Services, Inc.,* 185 F.3d 1093, 1098 (10th Cir. 1999) (quoting *Smith v. St. Louis University,* 109 F.3d 1261, 1264 (8th Cir.1997)). Because discrimination claims often turn on the employer's intent, courts ordinarily consider summary judgment inappropriate to settle an issue like intent, *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 530 (10th Cir.1994); *see Courtney v. Biosound, Inc.,* 42 F.3d 414, 418 (7th Cir.1994) ("[T]he summary judgment standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." (quotation and citation omitted)). Even so, summary judgment is not "per se improper," *Washington v. Lake County, Ill.,* 969 F.2d 250, 253 (7th Cir.1992), and may be useful in weeding out claims and cases obviously lacking merit, *Summers v. State Farm Mut. Auto. Ins. Co.,* 864 F.2d 700, 709 (10th Cir.1988), *overruled on other grounds, McKennon v. Nashville Banner Pub. Co.,* 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995).

## STATEMENT OF FACTS

The following facts are either uncontroverted or, if controverted, construed in the light most favorable to the plaintiff.

1. The plaintiff Neala Burnett ("Burnett") began working for the defendant Pizza Hut of America, Inc. ("Pizza Hut") in September of 1977 handling a variety of work such as food preparation, serving tables, and cooking. In November of 1978, she became a restaurant manager for Pizza Hut.

2. In 1990, Burnett began experiencing sleeplessness, muscle and joint pain, depression, and generalized fatigue and sought medical treatment for these symptoms.

3. In 1992, Burnett began visiting Dr. Gilhousen, an orthopedic specialist. She prepared a narrative description and history of her symptoms and her work as a restaurant manager to assist Dr. Gilhous-

en in treating her. (Def.Ex.3). In relevant part, Burnett wrote:

> I believe in management by example so I always try to work hard and encourage my people to do the same. The work is hard, with a great many repetitive movements, making pizza, cutting pizza, ringing up the cash register, serving tables, bussing tables, restocking and putting up the cases of good (sic) that come in each week, cleaning and sweeping and all the while managing employee performance. I work on the computer a great deal and am responsible for several special projects for my supervisor as I am the senior manager in the area.

(Def.Ex.3, p. 2).

4. Burnett wrote the area manager, Lee Johnson, a letter dated June 28, 1992, advising him that she suffered from pain in all the joints of her upper body, her wrists, hands, fingers, elbows shoulders, neck and back. She further wrote that it was difficult for her to work with this condition "as every activity I do in the unit involves these areas and causes me extreme pain." (Def.Ex.4). She advised Johnson that she was going "to make use of the sick pay" available in an effort to resolve her health problems and asked him to keep her informed "as to what action if any" he decided to take concerning her. (Def.Ex.4). Burnett's request for a leave of absence was granted.

5. On July 23, 1992, Burnett saw Dr. Kathryn Welch, a rheumatologist, for the first time. Dr. Welch diagnosed her condition as fibromyalgia, musculoskeletal pain, and inflammatory arthritis. Dr. Welch defines fibromyalgia as a disorder causing widespread musculoskeletal pain, including joint pain that reaches all four quadrants of the body. It has been associated with other symptoms such as headaches, irrita-ble bowel syndrome, a sleep disorder, and severe fatigue.

6. Burnett wrote Dr. Welch on December 10, 1992, stating that her supervisor had instructed her to apply for long-term disability and social security benefits. Pizza Hut's area manager assisted Burnett in applying for the long-term disability benefits with its carrier, Aetna Life Insurance Co. ("Aetna"). In her disability notice dated December 4, 1992, Burnett represented that she was totally disabled and unable to work and that the date of her disability was June 1, 1992.[1]

7. Dr. Welch prepared a letter dated December 21, 1992, describing Burnett's physical difficulties with performing her job and imposing restrictions on her work activities. The letter related that Burnett now worked a minimum 50–hour work week which was not regularly scheduled. Dr. Welch included the following the work restrictions:

> She is unable to lift more than 20 pounds. She should not be doing repetitive motions of her upper extremities, and should not be doing extended computer or phone work. It is much better for her to be on a regular schedule, as she has increased symptoms of stiffness and pain when she is not.

(Def.Ex.8, p. 9). This letter was given to Pizza Hut.

8. In January of 1993, the plaintiff signed an application for social security disability benefits in which she represented that she became unable to work because of a disabling condition on June 1, 1992, and that she still was disabled. In her pain questionnaire submitted the same month, Burnett described her job as "very stressful and physical" and involving "a lot of repetitive motions using the upper

---

1. In an effort to controvert this statement as well as others to follow, the plaintiff cites to pages from her deposition. The plaintiff, however, has not attached or submitted many of those cited pages for the court to review. As a result, several of the plaintiff's assertions stand unsupported by admissible evidence.

Some of the deposition selections can be referenced by looking to the exhibits that the defendant includes in its motion and reply, but many cannot. Pursuant to D.Kan.R. 56.1, the court will not consider any assertions that are not supported with an evidentiary foundation.

body." (Def.Ex.11). She made similar statements in her disability report given to the Social Security Administration. (Def.Ex.12). She described her work in these terms: walking three hours a day, standing three hours a day, sitting one hour a day, frequent bending, constant reaching, lifting and carrying dough up to 20–40 pounds for 20 feet, cheese up to 30 pounds for 10 feet, pizzas 1 to 7 pounds, and dishes of varying weight.

9. In an attending physician statement dated March 19, 1993, and given to Aetna, Dr. Welch described Burnett's limitations as 20 pounds of lifting and no repetitive motions particularly in the upper extremities, and restricted Burnett to a 40–hour work week of regularly scheduled hours. In a subsequent letter dated July 7, 1993, Dr. Welch reiterated her restrictions for Burnett:

> She has a lifting restriction not more than 20 pounds. She is restricted from doing repetitive motions of her upper extremities and should not be doing extended computer or phone work over 30 minutes at a given time. Upper extremity activities which include repetitive extended effort increase her neck, upper back, and shoulder pain.

(Dk.89, Ex. 6). In her attending physician statement dated April 18, 1994, Dr. Welch repeated the same limitations and restrictions stated in the March 1993 statement.

10. Burnett wrote Pizza Hut's Human Resource Center a letter dated March 12, 1993, in which she stated her frustration over being told that Pizza Hut did not have a position available for someone with her medical condition and restrictions, while she had not yet received any disability benefits.

11. After learning that Aetna had denied her claim for long-term disability benefits, Burnett again wrote Pizza Hut of her growing frustration with the situation. "Copies of my restrictions have been sent to Pizza Hut and Aetna, my doctor has written very specifically concerning my abilities and restrictions, and I have been told by Pizza Hut representatives that I must be 100% to return to work as restaurant manager. Exactly what am I supposed to do?" (Dk.89, Ex. 17).

12. In March of 1993, the plaintiff learned that the Social Security Administration had denied her claim for benefits. Her request for reconsideration was denied in May of 1993, on findings that her medical condition did restrict her ability to work, may prevent her from doing any of her past jobs, but "does not prevent . . . [her] from doing less demanding work." (Dk.89, Ex. 19).

13. By letter dated May 26, 1993, Burnett's attorney wrote Pizza Hut as follows in relevant part:

> Pizza Hut, through the regional manager, Lee Johnson, has informed Ms. Burnett that she will not be allowed to return to employment unless she has no restrictions.
>
> . . . .
>
> The corporation's policy of requiring no restrictions before employing an individual is in clear violation of the Kansas Act Against Discrimination and the Americans with Disabilities Act. Your failure to pay her long-term disability benefits is verification that the corporation can reasonably accommodate any restrictions that she might have.
>
> The purpose of this letter is to inform you that if Ms. Burnett is not returned to employment with your company at a comparable position within commuting distance of her residence, or approved for long-term disability benefits, we will file a complaint with the Kansas Human Rights Commission and the Equal Employment Opportunity Commission. As you may know, both of those statutes provide for punitive damages if an employer discriminates against a disabled individual.

(Dk.89, Ex. 20).

14. In June of 1993, at the direction of Aetna, Burnett was evaluated by Dr. Riondonelli with the KU Medical Center. Following the evaluation, Dr. Riondonelli is-

sued his report and accompanying letter which stated in pertinent part:

> As you can see, I do not believe this patient is at maximum medical improvement at this time, nor do I believe we have a complete and adequate diagnostic profile with respect to possible electrodiagnostic testing, a psychological evaluation, and formal job site evaluation and functional capacity evaluation at this time. With this additional information I believe I can address your specific questions with respect to patient's ability to return to modified duty at present time, perhaps while work hardening or some interim treatment is undertaken on her behalf. If she is at MMI based upon psychological profile the functional capacity evaluation would be helpful to address any permanent restrictions which are applicable in this case.

(Dk.89, Ex. 22).

15. By letter dated July 7, 1993, Aetna explained that it had reconsidered its earlier denial of Burnett's application in light of further information provided by Pizza Hut regarding the work requirements for restaurant managers. Aetna found that Burnett was eligible for monthly benefits commencing December 1, 1992, and "continuing for up to 18 months as long as" she remained disabled from her former position. She continued to receive those benefits through July 3, 1994.

16. Aetna still proceeded with a work hardening functional capacity evaluation that was performed on July 12, 1993. Based on the testing, she was placed in the "light work level (lifting 20 lbs infrequently and 10 or less lbs frequently)." (Def.Ex.15). Burnett described her job duties as making pizzas, putting them in and removing them from the oven, cutting pizzas, running the cash register, unloading inventory, loading data onto the computer, handling the telephone, and cleaning in the kitchen and dining area. Burnett further said that she commonly worked 10 to 12 hours daily and 50 hours per week. A job site evaluation apparently was never performed for Dr. Riondonelli.

17. In August of 1993, Burnett wrote Pizza Hut requesting financial assistance from Aetna in taking a H & R Block tax course. Aetna approved the Burnett's rehabilitation program through H & R Block. She completed the tax preparation course and began working as a bookkeeper and tax preparer in 1994.

18. During the eighteen months that she received long-term disability benefits, Burnett did not contact Pizza Hut about returning to work. By letter dated July 11, 1994, Aetna informed Burnett that she was no longer qualified to received long-term disability benefits. For the first 24 months, Burnett was qualified to receive benefits because she was totally disabled from her former occupation of restaurant manager. To continue receiving benefits, Burnett would have to be totally disabled from performing any reasonable occupation for which she was qualified. Aetna explained that it had reviewed her claim and determined that there were several job options available to her.

19. In response, Burnett wrote Aetna a letter dated July 14, 1994, describing her views on the dilemma facing Pizza Hut and Aetna and suggesting a possible resolution:

> Pizza Hut has made it clear that they now consider me a liability; the difficulty I had in getting some sort of decision out of them last summer somewhat soured the loyalty and faith I had in the company I had invested 15 years of my life in. Also, I'm sure they understand the risk involved physically should my condition worsen as a result of being required to perform outside the guidelines of my limitations. My condition was first diagnosed in 1990 and limitations were set for me then which proved impossible to follow due to the company's emphasis on labor reduction and the very nature of the job of being a manager, which by it's nature means that if there is an emergency, or a short-handed situation, or any number of happenings, it is the manager who has to fill

in, stay late, work the extra hours, etc. I tried to follow the limitations set, and modify my work so that I did not perform functions that were damaging, but it proved impossible most of the time and I lived with constant pain and the frustration that grew from that. I have no doubt that my job worsened my condition, and I'm sure that is not a situation anyone wants to see happen.

I understand that Pizza Hut and Aetna are in difficult positions here. Pizza Hut knows I am a potential liability to them if they put me back to work. Aetna doesn't feel they should pay me for being disabled if there is something I can do to support myself. Pizza Hut cannot terminate me as that would be a violation of the Americans with Disabilities Act which requires the employer to make reasonable accommodation for the individual with a disability. I understand agree with all these concepts. I have no fear of being able to support myself, . . . .

I feel an appropriate solution would be for the company to provide me with funds for rehabilitation . . . .

(Def.Ex.24).

20. Todd York, a Pizza Hut employee since December of 1984, was a restaurant manager from March 1985 to August 1987 and has worked as an area manager since 1994. York avers that the restaurant manager job "is a physically demanding job that involves physical labor that is repetitive in nature." "[I]t is essential for a Restaurant Manager to be able to perform all of the subordinate job functions in the restaurant, as many times they must train subordinate employees, help out during busy times and fill in for employees who are late or fail to arrive as scheduled." He further avers:

A Restaurant Manager is responsible for making sure that every job in the restaurant is performed. Therefore, a Restaurant Manager must be able to and is required to perform all of the physical job functions. A Restaurant Manager is required to help perform or must actually perform the physical jobs when they are not getting done or a subordinate is tardy or absent. . . . As an Area Manager, I have observed all of my Restaurant Managers performing these functions.

The foregoing physical and repetitive job functions are essential functions of the job of a Pizza Hut Restaurant Manager.

. . . The amount of time spent by the Restaurant Manager performing the foregoing functions may vary depending upon the local events, for example, football games, promotions, time of the year, the season, time of the day, sales volume and customer demand. On busy days or nights, a Restaurant Manager may spend several hours performing physical labor tasks.

. . . .

Pizza Hut employs a Field Management System for labor planning and daily labor schedules . . . .

The system prepares a labor plan and explains in detail how many people a manager should have on staff and how best to deploy them. The system prepares one of these plans for each day. The plan is called the Daily Labor Schedule. The Daily Labor Schedule forecasts direct hours, which include production, prep, cleaning, teleservice, delivery driver, PFS delivery-related activities, such as nightly books, shift change tasks and scheduled (preventative maintenance). The system assumes that the manager will be performing some direct hours in addition to overseeing the crew.

. . . .

The physical and repetitive functions and tasks could not be eliminated without fundamentally altering the nature of the job of a Pizza Hut Restaurant Manager. If a Restaurant Manager cannot perform physical labor functions, when required, the restaurant cannot function properly, which would result in decreased productivity, decreased customer satisfaction and decreased sales. Further, if the Restaurant Manager

does not perform the physical labor tasks, the other employees in the restaurant would have additional labor tasks to perform over and above those that they are already required to perform. In addition, the other employees would be required to work longer hours.

(Def.Ex.28).[2]

21. As a restaurant manager for Pizza Hut, Burnett performed physical and repetitive tasks.

22. In a letter dated January 9, 1995, Dr. Welch wrote that Burnett's "[w]ork restrictions remain unchanged" and that "overuse or too much activity will increase her symptoms as will stress." (Def.Ex.8).

23. In 1995, the plaintiff retained Joane Wyrick, an occupational therapist, to perform a functional capacity evaluation. The plaintiff's counsel wrote Ms. Wyrick a letter dated August 17, 1995, enclosing, *inter alia*, some additional information on a restaurant manager's duties. The plaintiff's counsel wrote: "Mrs. Burnett indicates, that these job descriptions, especially for restaurant manager, do not come anywhere near describing the actual duties they must perform. I have asked her to take the time to write out, on a separate piece of paper what she believes additional duties a restaurant manager for Pizza Hut must perform, based on her some 15 years experience." (Def.Ex.35).

24. The plaintiff wrote Ms. Wyrick a letter dated September 1, 1995, in which she described her duties as a restaurant manager as follows:

Jim asked me for a listing of the jobs a restaurant manager actually performed in light of the job description lists sent to me from Laura Leddy, Human Resources Manager for Pizza Hut who was my most recent contact with the company. A manager does everything on those lists, of course, since they are all jobs involving mainly mental process. A Manager will also do, physically, all accountabilities listed on the other job description lists of any other position within the unit, going and doing whatever needed to ensure a smoother operation. What is physically done will vary on a daily basis based on the needs at that time, affected by variables such as sales volume, individual crew people and their ability/experience level, basically anything involving people and the unpredictable nature of the decisions they make each day. A day with unexpected sales volume caused by abnormal events would be very different from the very slow day. A Friday night is different from a Monday afternoon. I could not begin to tell you the different physical activities a manager may do each day, ranging from cutting one pizza to many, from doing dishes to sweeping to carrying an order, to changing a trash liner to folding boxes, there are a multitude of tasks to be done constantly, and you try to keep yourself busy while directing the activities of those working with you to set a positive example and because there is always so much to do with a limit on the amount of physical hours you are able to use any given hour based on that hours sales volume.

. . . .

**2.** The plaintiff's citations to the written job descriptions do not controvert York's averments. The plaintiff argues that the descriptions do not mention specifically any physically demanding repetitive tasks. The court agrees with the defendant that this does not create any genuine issue of material fact. First, the job descriptions do not contain any terms expressing the physical demands placed on a restaurant manager. Second, the descriptions plainly contemplate that a manager's functions will vary with sales volume and that those functions will include the production and service work typically done by hourly employees. Third, other written documents plainly refer to the manager regularly performing such functions. Fourth, the written job descriptions are not the controlling evidence regarding what job functions are essential. Finally, before filing this lawsuit, the plaintiff made numerous statements and representations regarding her work as a restaurant manager that are entirely consistent with York's description of a restaurant manager's functions.

Professor Wyrick asked me to make a list of activities I absolutely would not want to do in the unit environment. That is a difficult task given the wide variety and variables involved on a daily basis as I discussed earlier. It is further complicated by the nature of the disorder itself.... I do know, however, that I would never want to be in the position to have to put away PFS, the supply order, or handle supplies in case units without them being broken down into smaller units. Pizza Hut uses mostly commissary dough now, a frozen product that doesn't require too much prep, but if there is dough to be made and panned out I would try to avoid that. I would also try to avoid being stuck in any one position in the unit for a period of time since all positions within a unit require repetitive motion. I would not want to have to cut too many pizzas, since I feel extended work on the cut table exacerbated this problem because in the early days the pain was felt only after weekends with the long hours and high volume. With the varying nature of this disease it would be hard for me to pin down too much more. I'm always willing to do anything possible, but what is possible may change on a daily basis.

(Def.Ex.36).

25. By letter dated September 12, 1995, Pizza Hut advised the plaintiff's counsel that they were placing Burnett "on a personal leave of absence for 60 days. The letter recited 'Pizza Hut's policy [that] at the end of the 60 days, if Ms. Burnett has not returned to work at Pizza Hut, she will be terminated.'" (Def.Ex.38). The letter summarized Pizza Hut's understanding of the medical restrictions which Dr. Welch had placed on Burnett. The letter concluded with the following:

Based on these restrictions, Pizza Hut does not have a job for which Ms. Burnett is qualified in an office or Pizza Hut unit. If Ms. Burnett's condition has improved and her current restrictions are different than those listed above, please let us know. Within the next 60 days,

Pizza Hut will gladly work with your office or an occupational therapist to determine what, if any, Pizza Hut job, with reasonable accommodations, Ms. Burnett is able to work.

(Def.Ex.38).

26. In October of 1995, Ms. Wyrick, the plaintiff's occupational therapist, visited a Pizza Hut site to observe the essential tasks of a restaurant manager. In her written report dated October 13, 1995, Ms. Wyrick opined:

Mrs. Burnett would be able to demonstrate the essential tasks of all the other jobs described in the written Pizza Hut job descriptions, however, she would not be able to continue to do these labor intensive tasks as her fibromyalgia can be exacerbated by physical exertion and repetitive motion.

(Def.Ex.39). As apparent from her report, Ms. Wyrick relied exclusively on her interpretation of the written job descriptions in reaching her conclusion as to what are the essential job functions of a Pizza Hut restaurant manager:

A review of the written job description provided by Pizza Hut shows that the essential functions of the position of restaurant manager are to:

1. Manage Restaurant Environment
2. Marketing
3. Manage Employee Performance

The manager's job description does not indicate the necessity to perform any physical tasks or to assume the total job responsibilities of each and every supervised employee. The terms used in the manager's job description describe a cognitive and interpersonal relationship with customers, employees and insurance of a quality product. The Area Manager, G.R. Laughlin assured me that all managers and assistant managers were expected to work a minimum of a 50 hour week and had to be physically able to assume all other job tasks of an employee who might call in sick or at peak times when the restaurant was un-

der staffed. He indicated that the ability to perform all work tasks was essential, but he was not clear as to why this was not indicated in the written job description.

. . . .

Mrs. Burnett has worked for Pizza Hut all of her life. She served as a restaurant manager since 1977 and she reports that her performance evaluations have been very good. Her condition of fibromyalgia does not effect her ability to manage and to supervise. She can perform all of the essential tasks stated in the manager's written job description. Her disability prevents her from performing, as a regular part of her job, the tasks that are assigned to the employees she supervises. I would, therefore suggest the following as reasonable accommodations that would allow her to continue serving Pizza Hut as a manager:

  1. A comfortable stool placed behind the counter to eliminate long standing when interacting with the public.

  2. Work hours should be scheduled so that she does not work late in the evening and aggravate the sleep disorder that is part of the fibromyalgia condition.

  3. Employ one or more individuals at $5.50 per hour, 40 of the 50 hours she would work a week to assure that the restaurant is adequately staffed. Mrs. Burnett would, therefore, not have to perform any non managerial job tasks.

(Def.Ex.39).

27. Dr. Welch wrote the plaintiff's counsel a letter dated October 19, 1995, observing: "From the things that Mrs. Burnett has told me and the job descriptions, I think that some of the heavier lifting she does as a manager and the repetitive activity that is sometimes required can exacerbate fibromyalgia symptoms." (Def.Ex.8).

28. In a letter dated October 25, 1995, the plaintiff's counsel wrote Pizza Hut requesting various documentation and providing a copy of Wyrick's written report.

Counsel for Pizza Hut responded that the accommodations suggested in Wyrick's report were not reasonable, that Burnett's medical reports appeared to show her incapable of performing a manager's essential functions, and that Pizza Hut would consider attempting to locate a vacant office or clerical position for which Burnett might be suited if she was interested.

29. The plaintiff's counsel replied by letter disputing that the physical tasks were essential job functions of a managerial position and limiting Burnett's interest to only those other positions in which she could earn salary and benefits equal to a restaurant manager and would be within a reasonable commuting distance of her present home.

30. Pizza Hut engaged in a process with Burnett to determine if reasonable accommodations existed that would allow her to return to work. With the physician's updated statement and restrictions, Pizza Hut evaluated potential positions for which Burnett was qualified. Besides searching for other restaurant and office jobs, Pizza Hut provided her with information regarding responsibilities and duties of different positions so she could discuss them with her physician to determine if she could perform them or if accommodations were necessary. Pizza Hut concluded there were no vacant positions available which would be consistent with the work restrictions placed on the plaintiff, for which she was qualified or which she would accept.

31. Pizza Hut's policy is that a voluntary termination occurs if an employee fails to return to work after a leave of absence. Pizza Hut's procedures include generating every other month a list of active employees who have not been paid within the preceding three months and who are not on a leave of absence. The plaintiff's name appeared on a report generated on December 8, 1995, as an employee who had not been paid during the previous three months and who was no longer on personal leave. Thus, Pizza Hut volun-

tarily terminated Burnett on December 27, 1995. The defendant does not controvert the plaintiff's representation that she first learned of this termination in September of 1996.

32. Burnett signed a charge of discrimination on December 18, 1995. The charge is dated as having received by the Equal Employment Opportunity Commission ("EEOC") on December 27, 1995. Pizza Hut has no record of receiving a copy of this charge dated December 18, 1995. In March of 1996, Pizza Hut received the first charge of discrimination relating to the plaintiff, and the charge was dated February 20, 1996.

## CLAIMS

The plaintiff claims that due to her fibromyalgia she is a qualified individual with a disability under the ADA and that her disability is a recognized physical impairment that substantially limits her in the major life activity of lifting. The plaintiff asserts that she can perform the essential functions of her former position as restaurant manager and that the defendant should make reasonable accommodations so that she does not have to perform the non-essential physical tasks which would aggravate her condition. In short, the plaintiff claims that the defendant failed to return her to the position of restaurant manager with reasonable accommodations in violation of the ADA. In addition, the plaintiff claims that the defendant terminated her in retaliation for her exercise of rights under the ADA.

## ADA DISABILITY DISCRIMINATION

The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). Discriminatory acts prohibited under the ADA include "denying equal jobs and benefits" because of the disability, "not making reasonable accommodations to the known physical ... limitations," and "denying employment opportunities ... based on the need ... to make reasonable accommodations." 42 U.S.C. § 12112(b)(4); (5)(A) and (B). A "qualified individual

with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA further defines a "disability" as, *inter alia,* "a physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2).

Without direct evidence, the plaintiff's ADA claims are evaluated under the burden-shifting approach borrowed from *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Butler v. City of Prairie Village, Kan.,* 172 F.3d 736, 747 (10th Cir.1999). Under *McDonnell Douglas,* the plaintiff carries the initial burden of establishing a prima facie case by a preponderance of the evidence. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. A prima facie case raises " 'a rebuttable presumption' " of a discriminatory intent. *See Ingels v. Thiokol Corp.,* 42 F.3d 616, 621 (10th Cir. 1994) (quoting *Branson v. Price River Coal Co.,* 853 F.2d 768, 771 (10th Cir. 1988)). If a plaintiff fails to prove any element of his prima facie case, summary judgment is proper. After the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

To establish a prima facie case of discrimination under the ADA, the plaintiff must demonstrate: (1) that she is disabled within the meaning of the ADA; (2) "that she is qualified, that is, she is able to perform the essential functions of the job, with or without reasonable accommodation;" and (3) that the employer terminated or took adverse employment action against the plaintiff "under circumstances which give rise to an inference that the termination [or other action] was based on her disability." *Morgan v. Hilti, Inc.,* 108

F.3d 1319, 1323 (10th Cir.1997) (citations omitted); *see Siemon v. AT & T Corp.*, 117 F.3d 1173, 1175 (10th Cir.1997); *White v. York Int'l Corp.*, 45 F.3d 357, 360–61 (10th Cir.1995). For purposes of this motion only, the court will assume the plaintiff can present a genuine issue of material fact with respect to the first element of being disabled.

It is the second element of the plaintiff's prima facie case which most concerns the court here. The Tenth Circuit has adopted a two-tiered analysis for determining whether a person is "qualified" under the ADA. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1175 (10th Cir.1999).

> First, we examine whether the individual can perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if we conclude that the individual is not able to perform the essential functions of the job at issue, we must determine whether any reasonable accommodation by the employer would enable her to perform those functions.

*Anderson*, 181 F.3d at 1175 (citing *Milton v. Scrivner*, 53 F.3d 1118, 1123 (10th Cir. 1995)). To avoid summary judgment, the plaintiff must show that she "could the perform the essential functions of the job" despite her disability or "that a reasonable accommodation of ... [her] disability would have enabled [her] ... to perform the essential functions of the job." *Burch v. City of Nacogdoches*, 174 F.3d 615, 619 (5th Cir.1999).

*Essential Functions*

■ "The term 'essential functions' is defined as 'the fundamental job duties of the employment position the individual with a disability holds or desires.' " *Martin v. Kansas*, 190 F.3d 1120, 1130 (10th Cir. 1999) (quoting 29 C.F.R. § 1630.2(n)(1)). "Whether a particular function is essential is a factual inquiry." *Martin*, 190 F.3d at 1130 (citing 29 C.F.R. Pt. 1630, App. § 1630.2(n)). The essential functions of a job are "functions that bear more than a marginal relationship to the job at issue." *Milton v. Scrivner, Inc.*, 53 F.3d 1118,

1123 (10th Cir.1995). The inquiry focuses initially "on whether the employer actually requires employees in the position to perform the functions that the employer asserts are essential." 29 C.F.R. Pt. 1630, App. § 1630.2(n); *see Milton*, 53 F.3d at 1124. If the employer does require performance of those functions, "the inquiry will then center around whether removing the function would fundamentally alter the position." *Id.; see White*, 45 F.3d at 362. "[I]n making this inquiry, 'consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.' " *Martin*, 190 F.3d at 1130 (quoting 42 U.S.C. § 12111(8)). Regulations promulgated under the ADA address some of the relevant factors and evidence to consider:

> (2) A job function may be considered essential for any of several reasons, including but not limited to the following:
>
> > (i) The function may be essential because the reason the position exists is to perform that function;
> >
> > (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
> >
> > (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.
>
> (3) Evidence of whether a particular function is essential includes, but is not limited to:
>
> > (i) The employer's judgment as to which functions are essential;
> >
> > (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
> >
> > (iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630(n)(2) and (3).

Because the determination of what is an essential function often entails considering these different factors and weighing the facts, it "is often best" reserved for the jury. *Ingerson v. Healthsouth Corp.*, 139 F.3d 912, 1998 WL 88154, at *5 (10th Cir. Feb.26, 1998) (Table). This "does not mean every 'essential function' inquiry must go to the jury." *Id.* Summary judgment remains appropriate if no reasonable jury could find for the plaintiff after applying the factors on the facts of record. *Id.* With these rules and factors in mind, we turn the parties' arguments.

▇ The parties disagree over the essential functions of a restaurant manager. The plaintiff believes the dispute creates a genuine issue of material fact while the defendant maintains the plaintiff has not come forth with sufficient evidence or arguments to create such an issue. The plaintiff builds her position on what she believes to be a self-evident proposition: "a manager exists so he or she can manage." (Dk.88, p. 31). Relying on Wyrick's reading of the written job descriptions, the plaintiff contends a restaurant manager's essential functions are limited to managing the restaurant environment, marketing and managing employee performance and do not include the physical tasks otherwise performed by supervised employees. The plaintiff comments that her performance appraisals do not evaluate her ability to perform the physical work of supervised employees. From the Manager's Operations Manual, the plaintiff cites that a restaurant manager's functions are divided into six areas with floor management being the primary responsibility. Conceding that a restaurant manager may on occasion be required to perform the physical tasks typically assigned to subordinate employees, the plaintiff characterizes these tasks as "at best occasional or marginal and not an essential function." (Dk.88, p. 31).

As the defendant aptly observes, the plaintiff's position is overwhelmingly contradicted by the evidence of record that Pizza Hut requires its restaurant managers to regularly perform such physical work and that removing this function would fundamentally alter the position. First, Pizza Hut's different written documents plainly describe daily management time as including the physical and repetitive tasks otherwise performed by supervised employees.[3] Second, Pizza Hut considers it essential that a restaurant

---

**3.** The Manager's Operations Manual includes production and service within a manager's functions. Production and service is defined to include the preparing of ingredients and product, the opening and closing, and the servicing of customers. The Manual expressly states that a manager will "be working as a production person" in low volume periods. (Def.Ex.32, pp. 181–82). In addition, the Labor Planning User Guide given to managers states that its daily scheduling system "assumes that the manager will also be performing some direct hours in addition to overseeing the crew." The Guide defines "direct hours" to include such physical work as "production, prep, and cleaning." While the Operations Manual emphasizes the responsibility of "floor management;" it also defines "floor management ... [as] a method of managing the restaurant to be sure all activities that affect customer satisfaction are directed and controlled." *Id.* at p. 181. In short, the restaurant manager is accountable for and expected to perform whatever needs to be done in the restaurant to produce a quality product and provide quality service to Pizza Hut customers. (Dk.88, p. 31). A genuine issue of material fact is not created simply from the failure of the job descriptions to state expressly the physical activities required from a manager. The essential functions are determined by the actual demands of the job rather than the job description. *Ingerson v. Healthsouth Corp.*, 139 F.3d 912, No. 96–6395, 1998 WL 88154, at *6 (10th Cir. Feb.26, 1998); *Hall v. United States Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir.1988).

manager be able to perform all of the functions of supervised employees for purposes of training employees, helping out during busy times, filling in for late or absent employees, and covering positions during scheduled low volume periods. (Statement of Fact, ¶ 19). Third, the uncontroverted evidence is that all restaurant managers during the relevant time period, (Def.Exs. 28 and 29), even the plaintiff,[4] was responsible for making sure that every job was performed and was required to and did perform all of the subordinate job functions, including those of a physical and repetitive nature. Fourth, the uncontroverted evidence is that for reasons of productivity, customer satisfaction and sales volume it is essential for the restaurant manager to perform physical labor tasks when necessary. (Statement of Fact, ¶ 19).

"[O]nce the employer provides evidence that an element of a job is essential, the plaintiff must provide sufficient evidence to rebut that conclusion." *Ingerson v. Healthsouth Corp.*, 139 F.3d 912, 1998 WL 88154, at *4 (10th Cir. Feb.26, 1998) (Table) (affirmed district court's finding that lifting was an essential function of a registered nurse) (citing *Milton*, 53 F.3d at 1118). The plaintiff has not done so here. The mere allegation that these physical tasks are marginal, not essential, is not enough.[5] Her narrow and untenable reading of the defendant's written job descriptions does not further her position. Nor is the court persuaded by the plaintiff's argument that "[c]ommon sense dictates that the essential" function of a restaurant manager is to manage other employees

and not to perform those employees' jobs. (Dk.88, p. 30). "In many situations, an employer may create a position, the nature of which requires an employee to perform a multitude of tasks in a wide range of environments." *Anderson*, 181 F.3d at 1176. "It is not the province of the court to undermine" or question the defendant's legitimate operation of its restaurants. *See Anderson*, 181 F.3d at 1176 (citation omitted). Indeed, "[i]t is [the] employer's province to define the job and the functions required to perform it." *Id.* at 1177 (citation omitted). The record is replete with evidence showing Pizza Hut's legitimate business reasons for expecting and requiring managers to assist in performing the physical labor tasks when necessary. The court will not second guess the employer's judgment in requiring its restaurant managers to perform the physically demanding work of hourly employees work. In sum, the court concludes that the plaintiff's evidence is insufficient for a jury to find that the essential functions of a restaurant manager do not include performing the physically repetitive and demanding work of supervised employees as a regular part of training employees, helping out during busy times, filling in for late or absent employees, and covering positions during scheduled low volume periods.

We find no genuine issue of material fact as to Burnett's inability to perform without accommodation the essential functions of restaurant manager. The work restrictions imposed by Dr. Welch preclude the plaintiff from performing the physical tasks regularly done by a manager in

---

4. York avers that he observed Burnett performing these same physical labor tasks while she was a restaurant manager. (Def.Ex.28, ¶ 9). The plaintiff testified that as a restaurant manager she had done a lot of physical work at times. As reflected in the court's statement of facts (¶¶ 3, 4, 8, 15, 18, 20, 22, 23, and 26), the plaintiff has represented repeatedly that her work was physically demanding and stressful and required her to perform repetitive activity. The evidence is also uncontroverted that the amount of time a manager will spend on these physical tasks will vary depending on local events, pro-

motions, day of the week, and time of the day or year. (Def.Ex. 28, York's Aff. ¶ 3). In the plaintiff's own words, it is the "very nature of the job of being a manager ... that ... [when] there is an emergency, or a shorthanded situation, or any number of happenings, it is the manager who has to fill in, stay late, work the extra hours, etc." (Def.Ex.24).

5. This is an allegation contradicted by the plaintiff's own testimony that customers would have received inferior service if she had not filled in as a cook or waitress during peak periods. (Def.Ex.1, p. 96).

training, assisting, and filling in or covering for the hourly employees. The record contains no medical release for the plaintiff to perform these physical tasks. Finally, the plaintiff's occupational therapist, Ms. Wyrick, opines that Burnett's "disability prevents her from performing, as a regular part of her job, the tasks that are assigned to the employees she supervises." (Dk.89, Ex. 29).

*Reasonable Accommodations*

When a job's essential functions cannot be performed without accommodation, an employer must provide those accommodations that are reasonable. Accommodations are reasonable unless they "would impose an undue hardship on the operation of the business" by "requiring significant difficulty or expense." 42 U.S.C. § 12111(10)(A). "Because the plaintiff bears the ultimate burden of proving he is a 'qualified individual' under the ADA, *see White v. York Int'l Corp.,* 45 F.3d at 361, he must produce sufficient evidence to make a prima facie showing that accommodation is possible, and then the burden shifts to the ... [defendant employer] 'to present evidence of its inability to accommodate.'" *Johnson v. City of Midwest City,* 166 F.3d 1221, 1999 WL 11312 (10th Cir. Jan.13, 1999) (Table).

Burnett fails to make a prima facie showing that accommodation was possible for her to perform the essential functions of restaurant manager. To perform the physical tasks ordinarily assumed by the restaurant manager, the plaintiff proposes hiring one additional full-time employee and assigning those physical tasks to that employee. An employer is not required under the ADA to accommodate an employee's disability by eliminating or modifying an essential function of his job. *See Martin,* 190 F.3d at 1133; *Smith v. Blue Cross Blue Shield of Kan., Inc.,* 102 F.3d 1075, 1076 (10th Cir.1996), *cert. denied,* 522 U.S. 811, 118 S.Ct. 54, 139 L.Ed.2d 18

(1997). The "[d]efendant is under no obligation to change the structure of its business or create a new position for Plaintiff." *Anderson,* 181 F.3d at 1177. Nor is an employer required to hire a new employee to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of his or her disability. *See Moritz v. Frontier Airlines, Inc.,* 147 F.3d 784, 788 (8th Cir.1998) (employer is not obligated under ADA to hire additional employees or reassign existing workers to assist plaintiff with her job duties). For that matter, an accommodation that would result in other employees having to work harder is not required. *Milton v. Scrivner, Inc.,* 53 F.3d at 1124 (citing 29 C.F.R. § 1630.2(p)(2)(v)). In short, the court does not consider the hiring and assignment of another employee to help plaintiff perform the duties of her job to be a reasonable accommodation under the ADA. The plaintiff offers no other accommodations that address her inability to perform the physically repetitive tasks at issue. Thus, the court finds that plaintiff is not a "qualified individual" within the meaning of the ADA because she could not perform the essential functions of the position she held with or without accommodation. The court grants the defendant's motion for summary judgment as to the plaintiff's ADA disability discrimination claims.

**ADA RETALIATION CLAIM**

The pretrial order reflects the following as the plaintiff's retaliation claim: [6]

In mid-December 1995, while plaintiff was still on medical leave, she filed a claim with the EEOC alleging discrimination against defendant for not returning her to the position of restaurant manager. On March 12, 1996 while her claim with the EEOC was pending, defendant terminated plaintiff as an employee and caused its personnel records

---

[6]. That the plaintiff is not a "qualified individual with a disability" does not bar an ADA retaliation claim. *See, e.g., Sarno v. Douglas Elliman–Gibbons & Ives, Inc.,* 183 F.3d 155, 159–60 (2nd Cir. July 9, 1999); *Mondzelewski v. Pathmark Stores, Inc.,* 162 F.3d 778, 786 (3rd Cir.1998).

to reflect that the date of plaintiff's termination was December 27, 1995. Plaintiff learned that she was terminated on or about September 6, 1996, when she received written inquiries from defendant about what she wanted to do with her retirement benefits because she had been terminated. It was not until January 1997, after defendant first provided plaintiff with documents in response to her request for production of documents, that plaintiff learned the actual date of the act to retroactively terminate her. Plaintiff claims that this action was in retaliation for the pursuit of her rights under the ADA.

(Dk.92, pp. 5–6).[7] Saying it did not know of the plaintiff's ADA claim until March of 1996, Pizza Hut seeks summary judgment on this claim. In arguing against summary judgment, the plaintiff alleges her filing of the EEOC complaint on December 18, 1995, is the protected activity on which she bases her retaliation claim.

The ADA makes it "unlawful to coerce, intimate, threaten or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, ..., any right granted or protected by this chapter." 42 U.S.C. § 12203(b). To establish a prima facie case of retaliation under the ADA, the plaintiff must show: "(1) protected employee action; (2) adverse action by an employer either after or contemporaneous with the employee's protected action; and (3) a causal connection between the employee's action and employer's adverse action." *Morgan v. Hilti, Inc.*, 108 F.3d at 1324. "By filing an EEOC claim, Plaintiff engaged in protected activity." *Anderson,*

181 F.3d at 1178 (citation omitted). Termination is an adverse employment action. *Id.* The timing of the termination is critical here.

The evidence of record establishes the following uncontroverted facts. The plaintiff signed an EEOC discrimination complaint on December 18, 1995, and the EEOC apparently received it on December 27, 1995.[8] The Human Resources Service Center for Pizza Hut generated a computer report dated December 8, 1995, that listed active employees who had not been paid for at least three months, and the plaintiff's name appeared on the report. The memorandum accompanying this report included directions that each listed employee was either to be terminated or placed on leave of absence and that terminations would be "processed with a December 27th term date and a TVO1 term code." (Def.Ex.43, Aff.Ex.1). The plaintiff's chronological history report which was generated by a computer on March 12, 1996, shows the plaintiff was terminated on December 27, 1995, with a TVO1 code. (Def.Ex.43, Aff.Ex.3). There is no evidence of record showing that Pizza Hut was sent or received a copy of the EEOC complaint dated December 18, 1995. The only charge of discrimination that the defendant received was dated February 20, 1996, and was received on March 1, 1996.

Because the effective date of the plaintiff's termination, December 27, 1995, is the same day that the EEOC received the plaintiff's charge of discrimination, the second element of the plaintiff's prima facie case is technically satisfied. As for the third element, the court does not believe

---

7. The plaintiff does not assert in the pretrial order any retaliation claim based on representations by the defendant that she needed to be one hundred percent before she could resume her employment. Because the pretrial order governs the claims at this point in time, the court does not consider any such claim to be pending in this suit.

8. In her memorandum opposing summary judgment, the plaintiff argues:

> On December 15, 1997, Plaintiff's lawyer wrote Pizza Hut's lawyer that its offer to put Plaintiff back to work as an hourly worker was rejected and that an EEOC complaint was going to be filed. So Pizza Hut was put on notice Plaintiff was going to seek immediate judicial redress for her discrimination.

(Dk.88, p. 37). The plaintiff did not attach any evidence of record substantiating this allegation. The events at issue occurred in 1995 and not 1997.

the evidence of record creates a genuine issue of material fact regarding a causal connection. There is no evidence to show the defendant was aware before March of 1996 that the plaintiff had filed or was filing an ADA claim. The plaintiff's allegations that the defendant altered its computer records and other forms to cover up the retaliation is simply baseless speculation. The court can find nothing implausible, inconsistent or suspicious in the defendant's timing of the termination or in its use of the standard procedures and policies that would sustain a reasonable inference of retaliation. Unable to find an inference of retaliatory intent from the plaintiff's proof, the court sustains the defendant's motion for summary judgment on the plaintiff's retaliation claim.

IT IS THEREFORE ORDERED that the defendant Pizza Hut's motion for summary judgment (Dk.75) is granted on the grounds stated above.